FILED
2023 Sep-29  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **JOANNA SANDERS,** | } | |
| **Plaintiff,** | } } | |
| **v.** | } } | |
| **KILOLO KIJAKAZI,** **ACTING COMMISSIONER OF** **SOCIAL SECURITY,** | } } } } } | **CASE NO.:   5:21-cv-00383-MHH** |
| **Defendant.** | } } | |

## <u>MEMORANDUM OPINION</u>

Ms. Joanna Sanders has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. Sanders's claims for disability insurance benefits and supplemental security income based on an Administrative Law Judge's finding that Ms. Sanders was not disabled.  Ms. Sanders argues that, in denying her request for benefits, the Administrative Law Judge—the ALJ—improperly evaluated Ms. Sanders's subjective complaints of pain under the Eleventh Circuit pain standard.  After careful review, the Court affirms the Commissioner's decision.

1

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Sanders had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited September 15, 2023).

*Winschel v. Comm'r of Soc. Sec. Admin*, 631 F.3d 116, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Sanders applied for disability insurance benefits on August 28, 2017 and for supplemental security income on September 16, 2017. (Doc. 8-4, pp. 69-70; Doc. 8-6, pp. 2-9).[2] Ms. Sanders initially alleged that her disability began on February 1, 2014. (Doc. 8-6, p. 4). Ms. Sanders later amended her disability onset date to October 7, 2017. (Doc. 8-6, p. 28). The Commissioner initially denied Ms. Sanders's claims, and Ms. Sanders requested a hearing before an ALJ. (Doc. 8-4, pp. 46, 66, 68; Doc. 8-5, pp. 11-12). Ms. Sanders and her attorney attended a hearing before the ALJ on June 27, 2019. (Doc. 8-3, p. 52). A vocational expert testified via telephone at the hearing. (Doc. 8-3, pp. 54, 69-73).

The ALJ issued an unfavorable decision on August 29, 2019. (Doc. 8-4, pp. 75-86). On March 26, 2020, the Appeals Council vacated the ALJ's August 29, 2019 decision and remanded the case to the ALJ to consider evidence submitted by

_____

[2]   Ms. Sanders filed previous applications under Title II and Title XVI that an ALJ fully adjudicated and denied on October 3, 2016; Ms. Sanders did not appeal that final decision to a district court. (Doc. 8-3, p. 15; Doc. 8-4, pp. 5-16). Therefore, the ALJ in the present appeal applied the doctrine of res judicata and did not consider any period on or before October 3, 2016 in reaching her October 16, 2020 decision denying Ms. Sanders disability benefits. (Doc. 8-3, p. 15).

Ms. Sanders before the ALJ's August 29, 2019 decision.  (Doc. 8-4, pp. 92-94).  On September 17, 2020, Ms. Sanders and her attorney attended a second hearing via telephone before an ALJ. (Doc. 8-3, pp. 38, 40).  A vocational expert testified at the hearing.  (Doc. 8-3, pp. 69-73).

The ALJ issued another unfavorable decision on October 16, 2020.  (Doc. 8-3, pp. 15-30).  On January 15, 2021, the Appeals Council declined Ms. Sanders's request for review, (Doc. 8-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Sanders's Medical Records*

To support her application, Ms. Sanders submitted medical records that relate to the diagnoses and treatment of degenerative disc disease, degenerative joint disease, chronic pain syndrome, lumbar and cervical radiculopathy, numbness, mild joint degenerative arthrosis, major depressive disorder, and anxiety.  The Court has reviewed Ms. Sanders's complete medical history and summarizes the following medical records because they are most relevant to Ms. Sanders's arguments in this appeal.[3]

---

[3] Ms. Sanders did not raise an issue regarding her alleged mental limitations.  (*See* Doc. 12).  The Court has reviewed the medical records and medical opinions in the administrative record, but the Court will discuss only the records that relate to Ms. Sanders's alleged physical limitations and symptoms.

Ms. Sanders underwent neck surgery in 2006 or 2007. (Doc. 8-7, p. 47). A September 2012 MRI showed "mild diffuse disc bulging" in Ms. Sanders's lumbar spine at L3-L4 and "facet arthropathy bilaterally" at L4-L4 and L5-S1 without stenosis. (Doc. 8-11, p. 129).[4] She had an anterior cervical discectomy and fusion at C5-C-6 and C6-C7 in 2013. (Doc. 8-12, pp. 125, 143).[5] The procedure was successful, but Ms. Sanders's pain gradually returned. (Doc. 8-12, p. 18).

On February 13, 2017, Ms. Sanders saw Dr. Roddie Gantt at Tennessee Valley Pain Consultants and complained of low back pain, joint stiffness and pain, numbness and tingling in her legs, and falls. (Doc. 8-12, pp. 15, 20-21). Ms. Sanders rated her pain at 8/10. (Doc. 8-12, p. 18). She reported that standing and walking aggravated her pain; rest, lying down, medication and massage alleviated her pain. (Doc. 8-12, p. 19). Dr. Gantt's physical examination revealed that Ms. Sanders had a normal range of motion, normal gait, and normal muscle mass. (Doc. 8-12, p. 21).

---

[4] "Facet arthropathy, also known as facet osteoarthritis, is a type of wear-and-tear arthritis affecting the spine. It affects the bony protrusions, called facet joints, that connect the bones of the spine. Symptoms include neck and back pain which can get worse with standing, twisting, or bending." *See* https://www.verywellhealth.com/facet-arthropathy-treatment-190440 (last visited September 15, 2023).

[5] Anterior cervical discectomy and fusion (ACDF) is a type of neck surgery that involves removing a damaged disc to relieve spinal cord or nerve root pressure and alleviate corresponding pain, weakness, numbness, and tingling. . . . A fusion surgery is done at the same time as the discectomy operation . . . to stabilize the cervical segment. A fusion involves placing bone graft and/or implants where the disc originally was in order to provide stability and strength to the area." *See* https://www.spine-health.com/treatment/spinal-fusion/acdf-anterior-cervical-discectomy-and-fusion (last visited September 18, 2023).

Ms. Sanders's medications included oxycodone and meloxicam for pain.  (Doc. 8-12, p. 23).  Dr. Gantt administered a lumbar epidural steroid injection to relieve Ms. Sanders's back pain.  (Doc. 8-12, p. 25).

Ms. Sanders returned to Dr. Gantt on April 25, 2017 and reported that the epidural steroid injection relieved her pain for only two weeks.  (Doc. 8-12, p. 6).  She complained of low back pain that radiated down her right buttock and calf and numbness from her calf to her foot.  (Doc. 8-12, pp. 2-3).  Ms. Sanders described her pain as "sharp" and "aching" and "worse than it [had] even been," but she reported the intensity of her pain at "6/10."  (Doc. 8-12, pp. 3, 6).  She indicated that her medication "barely help[ed]."  (Doc. 8-12, p. 6).  She stated that she "would have gone to the ER a lot" had it not been for the $400 deductible.  (Doc. 8-12, p. 6).  When CRNP Quattlebaum examined Ms. Sanders, Ms. Sanders was "either unable/unwilling to bend forward due to pain."  (Doc. 8-12, p. 7).

Dr. Gantt's physical examination showed a normal gait, tenderness to palpitation in the lumbar spine, decreased range of motion, pain with flexion, and intact sensation to touch.  (Doc. 8-12, p. 9).  Dr. Gantt indicated that he was "unable to accurately evaluate" the range of motion in Ms. Sanders's lower extremities because of her "effort during the exam."  (Doc. 8-12, p. 9).  Ms. Sanders's medications included oxycodone and meloxicam for pain.  (Doc. 8-12, p. 10).  Dr. Gantt cancelled a lumbar epidural steroid injection scheduled for May 12, 2017 and

referred Ms. Sanders for further spinal and neurological evaluation for her back pain. (Doc. 8-12, pp. 7, 10).

On Dr. Gantt's referral, Ms. Sanders saw Dr. Jason Banks at Huntsville Hospital Spine and Neuro Center on June 5, 2017.  (Doc. 8-12, p. 33).  Ms. Sanders complained of low back pain that radiated into both hips and buttocks and down her calves to her feet.  (Doc. 8-12, p. 33).  Ms. Sanders reported that her pain became "more severe" after the February 2017 epidural steroid injection at Tennessee Valley Pain Consultants.  (Doc. 8-12, p. 33).  Ms. Sanders indicated numbness in both legs; difficulty walking; joint pain, stiffness, weakness, and swelling; and muscle pain and weakness.  (Doc. 8-12, pp. 33-34).  Dr. Banks noted that Ms. Sanders had not received physical or chiropractic therapy for her pain.  (Doc. 8-12, p. 33).  The record of this visit is cut off and incomplete, so the Court cannot tell what finding Dr. Banks made.  (Doc. 8-12, pp. 33-34).

On June 5, 2018, Ms. Sanders saw neurologist Dr. Anjaneyulu Alapati and complained of back pain, tingling in her legs and arms, leg and muscle weakness, join pain and swelling, and difficulty walking.  (Doc. 8-12, p. 102).  Ms. Sanders reported that she had fallen six times in the preceding six months, and she had headaches "at least 4 times a week" that she attributed to shoulder and neck pain. (Doc. 8-12, pp. 102-03).  She indicated that she could provide self-care in her activities of daily living, could ambulate independently, had no "limitation to

7

mobility," and had a normal range of motion.  (Doc. 8-12, p. 105).  Dr. Alapati noted that Ms. Sanders's neurological exam was normal and that her overall symptoms were "suggestive of fibromyalgia."  (Doc. 8-12, p. 104).  An MRI of Ms. Sanders's brain was normal.  (Doc. 8-12, p. 114).  Dr. Alapati ordered a nerve conduction study of Ms. Sanders's extremities and prescribed Neurontin for her neuropathy.  (Doc. 8-12, p. 104).

On May 23, 2019, Ms. Sanders saw Dr. Morris Seymour at the Orthopedic Center after falling "off of a barstool."  (Doc. 8-12, p. 143).  She complained of an "extreme amount of neck pain with radiating symptoms into her left arm."  (Doc. 8-12, p. 143).  Dr. Seymour's physical examination revealed a "grossly normal" gait; no tenderness in Ms. Sanders's spine, joints, or shoulders; normal strength in all her upper extremities; no muscle atrophy; intact sensation; normal deep tendon reflexes; and normal range of motion in her cervical spine. (Doc. 8-12, p. 143).  X-rays revealed that her hardware at C5-6 and C6-7 was "well positioned," she had no instability on flexion extension, and she had an "extreme amount of arthritic change above her fusion at C3-4 and 4-5."  (Doc. 8-12, p. 143).  Dr. Seymour ordered an MRI of Ms. Sanders's spine and prescribed pain medication and muscle relaxers. (Doc. 8-12, p. 143).

Ms. Sanders underwent EMG nerve conduction testing on June 10, 2019 and September 18, 2019 that showed normal results with no "definite evidence of

peripheral neuropathy, carpel tunnel syndrome[,] or lower lumbar radiculopathy on either side." (Doc. 8-13, pp. 15, 27).[6]

On June 12, 2019, Dr. Saranya Nadella administered to Ms. Sanders an epidural steroid injection in her neck at C7-T1. (Doc. 8-12, p. 136). A June 26, 2019 MRI of Ms. Sanders's lumbar spine showed multilevel degenerative changes, "mild left and right protrusion of the disc" at L2 through S1, and mild canal and neural foraminal narrowing. (Doc. 8-12, p. 123). An MRI of her cervical spine showed normal realignment but degenerative and postoperative changes with moderate disc bulging at C3-C5 with no "definite bone deformity or compression." (Doc. 8-12, p. 124).[7] On July 8, 2019, Dr. Nadella performed facet joint injections in Ms. Sander's spine at L3-L4, L4-L5, and L5-S1 for pain relief. (Doc. 8-12, p. 134).[8]

---

[6] "Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission." *See* https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 (last visited September 15, 2023).

[7] "A bulging, or herniated, disk occurs when the spongy center of a disk in the spine pushes out through a tear in the outer, rubbery portion of the disk. It can press on the spinal cord and nerve roots, leading to pain and problems with mobility." *See* https://www.medicalnewstoday.com/articles/bulging-disk-in-back (last visited September 15, 2023).

[8] "A facet joint injection is performed to treat neck and back pain in combination with other non-surgical spine treatments like rest, medications, chiropractic manipulations, and physical therapy" and "place[s] medication directly into the joint." *See* https://www.treatingpain.com/treatments/facet-joint-injections/ (last visited September 18, 2023).

Ms. Sanders returned to Dr. Alapati on July 11, 2019 and complained of numbness in her feet.  (Doc. 8-13, p. 29).  Ms. Sanders reported that the Neurontin helped the burning and pain in her feet and that she had no muscle spasms.  (Doc. 8-13, p. 29).  She indicated that she was independent in all her activities of daily living.  (Doc. 8-13, p. 34).  Dr. Alapati's physical examination showed normal muscle strength, a normal gait, and normal and full range of motion in Ms. Sanders's cervical and lumbar spine.  (Doc. 8-13, p. 30).  Dr. Alapati diagnosed fibromyalgia and increased Ms. Sanders's dosage of Neurontin.  (Doc. 8-13, p. 30).

On October 17, 2019, Ms. Sanders saw Dr. Vytautas Pukis at Blossomwood Medical to establish care.  (Doc. 8-13, p. 78).  Ms. Sanders complained of "pain in multiple joints," lower back pain that radiated to her legs, muscle aches, and dizziness.  (Doc. 8-13, pp. 78-79).  Ms. Sanders denied having weakness or "sensation changes in the extremities."  (Doc. 8-13, p. 79).  Dr. Pukis referred Ms. Sanders to pain management and prescribed Flexeril for muscle spasms and indomethacin for pain.  (Doc. 8-13, p. 79).  At a follow-up with Dr. Pukis on November 19, 2019,  Ms. Sanders complained of pain in her back, neck, hips, and muscles and rated her pain at 8/10.  (Doc. 8-13, pp. 82, 86).  Dr. Pukis's physical examination revealed paraspinal muscle tenderness  but "[n]o spinal process tenderness to palpitation."  (Doc. 8-13, p. 87).

Upon referral by Dr. Pukis, on January 20, 2020, Ms. Sanders saw Dr. James Thacker at Huntsville Pain Management.   (Doc. 8-13, p. 40).   Ms. Sanders complained of neck and back pain that she rated at 8/10.  (Doc. 8-13, p. 40).   Dr. Thacker's physical examination showed mild tenderness in Ms. Sanders's cervical and lumbar spine, a mildly reduced range of motion in the lumbar spine, normal range of motion in the upper and lower extremities, full strength in all areas, intact sensation in all extremities, a normal gait, and normal deep tendon reflexes.  (Doc. 8-13, p. 44).  Dr. Thacker prescribed tizanidine as a muscle relaxer and hydrocodone for pain.  (Doc. 8-13, p. 46).

At a February 4, 2020 follow up with Dr. Thacker, Ms. Sanders reported her pain level a 5/10 and stated that she had "no real improvement in pain levels or symptoms."  (Doc. 8-13, p. 51).  She reported her "daily activity level to be 9 out of 10" and denied having "joint swelling, limitation of motion, muscle cramps, back pain, back spasms, painful joints, stiffness, leg cramps, head pain, neck pain, shoulder[] pain, [and] hip[] pain."   (Doc. 8-13, pp. 51, 53).   At follow up examinations with Dr. Thacker on February 18, March 5 and 25, and April 29, 2020, Ms. Sanders had mild to moderate tenderness in her spine, mild limitation in the range of motion in her spine, back pain, muscle stiffness and spasms, and neck pain. (Doc. 8-13, pp. 56-57, 61-62, 69-70, 74-75).  Ms. Sanders reported pain levels of 5/10 and 6/10 at these visits.  (Doc. 8-13, pp. 55, 60, 68, 73).

On May 27, 2020, Ms. Sanders saw Nurse Practitioner Kelly Young at Huntsville Pain Management and reported a pain level of 4/10 and "some improvement" in her symptoms with her treatment plan.  (Doc. 8-13, p. 105).  By a June 24, 2020 visit, Ms. Sanders reported that she was "doing well."  (Doc. 8-13, pp. 110-11).  At a July 29, 2020 visit with Dr. Thacker, Ms. Sanders reported her pain at 5/10.  Ms. Sanders had reduced range of motion and mild tenderness in her spine.  (Doc. 8-13, pp. 115, 117).

Ms. Sanders underwent hernia surgery in September 2020 and recovered "well" from the operation.  (Doc. 8-13, p. 123).  Dr. Ravindra Mailapur instructed Ms. Sanders to avoid lifting objects "more than 10-15 pounds" for six weeks.  (Doc. 8-13, p. 123).

### Dr. E.L. Mollohan's Consultative Examination

At the request of the Social Security Administration, Dr. Mollohan examined Ms. Sanders on February 12, 2018.  (Doc. 8-12, pp. 58-61).  Ms. Sanders reported neuropathy, chronic back pain, and carpal tunnel syndrome.  She described numbness and tingling down her legs and arms, muscle spasms, dull to sharp pain in her back, and numbness and tingling in her fingers that caused her to lose her grip.  (Doc. 8-12, pp. 58-59).  She indicated that gripping, lifting more than eight pounds, bending, climbing stairs, sitting more than 20 minutes, standing or walking more than ten minutes, laying flat, and weather changes aggravated her pain; medication,

heat, ice, stretches, and wearing a brace relieved her pain.  (Doc. 8-12, p. 58).  She rated her pain at 5/10 to 6/10 at best and 9/10 to 10/10 at worst.  (Doc. 8-12, p. 58).

During Dr. Mollohan's physical examination, Ms. Sanders rated her shoulder pain at 2/10, lumbar back pain at 3/10, bilateral hip pain at 3/10, and left knee pain at 3/10.  (Doc. 8-12, p. 60).  Dr. Mollohan noted that Ms. Sanders reported "no [c]ervical or [l]umbar radicular pain or . . . neurological symptoms [or] complaints" when he performed the "exam testing maneuvers." (Doc. 8-12, p. 61).  Dr. Mollohan reported that Ms. Sanders complained of generalized musculoskeletal soreness but exhibited "none of the 18 palpable muscular tender points," which he found inconsistent with the "diagnostic criteria for the [d]iagnosis of [f]ibromyalgia." (Doc. 8-12, p. 60).  Ms. Sanders had normal deep tendon reflexes, normal muscle strength, and no muscular atrophy.  (Doc. 8-12, p. 60).

Dr. Mollohan reported that Ms. Sanders had an antalgic gait with localized lower back pain when she walked 20 feet; she did not use an ambulatory assistive device.  (Doc. 8-12, p. 61).[9]  Dr. Mollohan noted that Ms. Sanders "could sit and/or stand for 30 minutes without complaint during the exam" and could "stand up from a seated position and get on/off the examination table without difficulty."  (Doc. 8-12, p. 61).

---

[9]   "An antalgic gait occurs when [someone] walk[s] with a limp because of pain."  *See* https://www.webmd.com/pain-management/what-is-antalgic-gait (last visited September 17, 2023).

Dr. Mollohan found that Ms. Sanders showed no neurological deficits consistent with carpel tunnel syndrome; could perform bilateral hand and finger dexterity repetitive movements; and had "mild difficulty grasping/lifting small to medium sized books and turning a door knob with both hands."  (Doc. 8-12, p. 60).  Ms. Sanders had no difficulty "picking up coins, paper clips, [and] buttoning [her] [s]hirt with both hands."  (Doc. 8-12, p. 60).

### Dr. Thomas Amason's Consultative Physical Residual Functional Capacity Assessment

On March 8, 2018, at the request of  the Social Security Administration, Dr. Amason reviewed Ms. Sanders's medical records and assessed her physical residual functional capacity.  (Doc. 8-4, pp. 59-63).  Dr. Amason opined that Ms. Sanders could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and could stand, walk, and sit with normal breaks six hours in an eight-hour workday. (Doc. 8-4, p. 59).  Dr. Amason stated that Ms. Sanders had unlimited ability to push and pull; frequently could balance; frequently could climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently could stoop, kneel, crouch, and crawl; and frequently could reach overhead and handle bilaterally.  (Doc. 8-4, pp. 59-60). Dr. Amason found that Ms. Sanders should avoid exposure to extreme cold and heat, vibration, and machinery and height hazards.  (Doc. 8-4, pp. 60-61).  Based on these findings, Dr. Amason opined that Ms. Sanders could perform unskilled work at the

light exertional level, including jobs as a checker, subassembler, and ticket printer and tagger.  (Doc. 8-4, pp. 65-66).

### Ms. Sanders's Function Report

At the request of the Social Security Administration, Ms. Sanders completed a function report in 2017.  (Doc. 8-7, pp. 36-43).[10]  She stated that she lived alone in her home and had no pets.  (Doc. 8-7, p. 37).  Ms. Sanders reported that she got up around 11:00 am each day and was "in bed again" by 8:00 pm; took hours to dress; had to stop and rest when bathing; could wash her hair; and needed help with cleaning.  (Doc. 8-7, pp. 36-41).  She indicated that she could make a sandwich and cook simple meals in the microwave, do one load of laundry a week, drive, and shop online.  (Doc. 8-7, pp. 36-41).  Ms. Sanders stated that she did not go out much and wanted to be left alone.  (Doc. 8-7, pp. 40-41).

Ms. Sanders indicated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use her hands, and get along with others. (Doc. 8-7, p. 41).  She stated that she could walk for 20 minutes at a time, but she did not "really walk [-] pain" and that a doctor prescribed a cane in 2009.  (Doc. 8-7, p. 42).[11]  Ms. Sanders reported that she could

---

[10]  Ms. Sanders did not date or sign her function report, but the index for the administrative record indicates that Ms. Sanders dated the report "10/10/2017."  (Doc. 8-3, p. 3).

[11]  Other than in Ms. Sanders's and her mother's function reports, the Court found no mention of a prescription for or Ms. Sanders's use of a cane in the medical records.  (Doc. 8-3, pp. 34, 42).

pay attention depending on her pain level, did not handle changes in routine well, could pay her bills, and could not handle a savings account or a checkbook.  (Doc. 8-7, pp. 39, 42).

### *Ms. Sanders's Mother's Third-Party Function Report*

Ms. Sanders's mother, Sandra Bailey, completed a third-party function report on October 7, 2017.  (Doc. 8-7, p. 28).  Ms. Bailey indicated that Ms. Sanders lived alone and had a small dog.  (Doc. 8-7, p. 29).  She reported that Ms. Sanders took "a while" to dress because she could not stand for long; could microwave a meal or make a sandwich; could do laundry and cleaning, but Ms. Bailey did the "deep cleaning"; could drive; shopped only for groceries; watched TV constantly; and spent time with family and grandchildren weekly.  (Doc. 8-7, pp. 28-32).

Ms. Bailey reported that Ms. Sanders could walk only short distances, had a hard time getting "back up," and had pain in her neck with reaching.  (Doc. 8-7, p. 33).  Ms. Bailey stated that Ms. Sanders could pay attention for 30 minutes, finished what she started, and used a cane when she went out.  (Doc. 8-7, pp. 33-34).  Ms. Bailey indicated that "because of pain," Ms. Sanders's personality had changed, she was depressed, and she spent "too much time alone."  (Doc. 807, pp. 32-33).

### *Ms. Sanders's First Administrative Hearing*

During her first administrative hearing on June 27, 2019, Ms. Sanders testified that she was in the process of divorcing her husband and lived with her mother so that her mother could help her.  (Doc. 8-3, pp. 60-61).  Ms. Sanders stated that she had degenerative disc disease that caused lower back pain that ran down her legs and caused tingling and numbness in her calves.  (Doc. 8-3, pp. 63-64).  She explained that she received "shots" for her back pain.  (Doc. 8-3, p. 63).  Ms. Sanders testified that the "second shot . . . hit [her] sciatic nerve," but her doctors told her there was nothing they could do for her.  (Doc. 8-3, p. 63).  Ms. Sanders stated that she had a fusion in her neck that was "messed up now" and caused pain down her arm and numbness in her hands.  (Doc. 8-3, p. 64).

She testified that she could lift and carry "probably eight to ten pounds," but could not do so for "40 minutes" or longer.  (Doc. 8-3, p. 64).  Ms. Sanders explained that she could stand for "10 to 15 minutes" before her legs went "numb," could sit for "about 10 to 15 minutes" before her back pain shot down her legs, and could do dishes or cook for "15 [to] 20 minutes."  (Doc. 8-3, pp. 64-66).  She stated that each day, she elevated her feet four hours or more and lied down about two hours.  (Doc. 8-3, p. 66).  Ms. Sanders testified that she had a hard time reaching overhead and could not squat, crawl, or twist and turn at the waist level.  (Doc. 8-3, p. 67).

Regarding her medication side effects, Ms. Sanders testified that her medications made her drowsy and caused her to take naps.  (Doc. 8-3, pp. 67-68).

Cherice Powell testified as a vocational expert.  (Doc. 8-3, p. 69).  She classified Ms. Sanders's past work as a hospital cleaner as unskilled, medium exertional level work.  (Doc. 8-3, p. 69).  The ALJ asked Ms. Powell to consider the work available to an individual with the same education, training, and work experience as Ms. Sanders, who could perform light work with the following limitations:

> frequent postural maneuvers.  No climbing of ropes, ladders, or scaffolds.  Frequent gross handling and overhead reaching with the bilateral upper extremities.  Avoid concentrated hot or cold temperature extremes or extreme vibration.  Avoid dangerous, moving, or unguarded machinery or unprotected heights.  Would be able to understand, remember, or apply simple instructions and tasks.  Limited to jobs involving infrequent and well explained workplace changes.  And would be able to concentrate and remain on task for two hours at a time sufficient to complete an eight-hour workday.

(Doc. 8-3, p. 69).  The ALJ assumed that an individual with those limitations could not perform Ms. Sanders's past work as a hospital cleaner.  Ms. Powell testified that the individual could work as a cleaner, with approximately 445,000 jobs available in the national economy; a shipping and receiving weigher, with approximately 72,000 jobs available in the national economy; and a marker, with approximately 249,000 jobs available in the national economy.  (Doc. 8-3, pp. 69-70).

In the ALJ's second hypothetical, she asked Ms. Powell to assume the limitations in the first hypothetical, but the individual was limited to occasional postural maneuvers and needed a sit or stand option "during the workday one or two minutes at a time at the workstation." (Doc. 8-3, p. 70). Ms. Powell testified that the individual could work as a shipping and receiving weigher from the first hypothetical; a small parts assembler, with approximately 196,000 jobs available in the national economy; and a folder, with approximately 430,000 jobs available in the national economy. (Doc. 8-3, pp. 70-71).

In her third hypothetical, the ALJ added the limitation that the individual would miss two or more days of work per month on a consistent basis. (Doc. 8-3, p. 71). Ms. Powell explained that limitation would preclude all competitive work. (Doc. 8-3, p. 71).

Ms. Sanders's attorney asked Ms. Powell to assume an individual with the previous limitations and added that the individual needed a sit or stand option at will, needed additional breaks outside of the customary breaks to nap for an "unknown duration," and could not maintain concentration or pace for two hours at a time because of medications. (Doc. 8-3, p. 72). Ms. Powell testified those limitations would preclude all competitive work. (Doc. 8-3, p. 72).

### *Ms. Sanders's Second Administrative Hearing*

After the Appeals Council's remand, the ALJ held a second hearing via telephone on September 17, 2020.  Ms. Sanders stated that she continued to live with her mother and that she (Ms. Sanders) had hernia surgery the day before the hearing. (Doc. 8-3, p. 43).  Ms. Sanders testified that after her first hearing, she contacted the Alabama Department of Vocational Rehabilitation for help finding a job.  (Doc. 8-3, p. 42).  Ms. Sanders indicated that she contacted vocational rehabilitation near the end of 2019 but did not know who she met with.  (Doc. 8-3, pp. 42-43).  She stated that "[t]hey didn't have a job, but of course, the COVID."  (Doc. 8-3, p. 42).  The ALJ pointed out that COVID was not prevalent at the end of 2019.  (Doc. 8-3, pp. 42-43).

Ms. Sanders testified that she had back and neck pain daily, but her neck pain was her "main problem."  (Doc. 8-3, p. 45).  She stated that her medications helped her pain, and she had no side effects from her medications.  (Doc. 8-3, pp. 45-46).  Ms. Sanders testified that she had to lay down about three hours each day because of her pain, could stand about ten to fifteen minutes at a time, experienced more pain in a seated position, and could not pick up anything "real heavy."  (Doc. 8-3, pp. 46-47).

Regarding her activities of daily living, Ms. Sanders testified that she did "very little" throughout the day and "sometimes" needed help with personal needs

such as bathing and dressing.  (Doc. 8-3, pp. 45-46).  She indicated that her mother

helped her put on shoes, and her mother and a friend shopped for her.  (Doc. 8-3, p.

47).  She stated that for chores, she picked up items and "wipe[d] stuff."  (Doc. 8-3,

p. 45).

Mr. James Adams testified as a vocational expert.  (Doc. 8-3, p. 48).  He noted

Ms. Sanders's past work as a hospital cleaner and testified that Ms. Sanders also had

past relevant work as a gate guard, classified as light exertional work, and as a

"material handler or receiving and unloading," classified as heavy exertional work.

(Doc. 8-3, p. 48).  The ALJ asked Mr. Adams to consider the work available to an

individual with the same education, training, and work experience as Ms. Sanders,

who could perform light work with the following limitations:

> occasional postural maneuvers[;] no climbing of ropes, ladders, or
> scaffolds[;]   frequent overhead reaching with the bilateral upper
> extremities[;] would need to avoid dangerous moving, unguarded
> machinery or unprotected heights[;] would be able to understand,
> remember[,] or apply simple instructions and tasks[;] would be
> limited to jobs involving infrequent and well explained workplace
> changes[;] and would be able to concentrate and remain on task for
> two hours at a time sufficient to complete an eight-hour workday.

(Doc. 8-3, p. 49).  Mr. Adams testified that individual could perform Ms. Sanders's

past work as a gate guard as actually and generally performed.  (Doc. 8-3, p. 49).

Mr. Adams stated that individual also could perform the light, unskilled jobs of a

salvage bagger, with 65,000 jobs available in the national economy; a garment

sorter, with 135,000 jobs available in the national economy; and a hand sander, with 41,000 jobs available in the national economy.  (Doc. 8-3, pp. 49-50).

In the ALJ's second hypothetical, she asked Mr. Adams to assume the limitations in the first hypothetical with the added limitation that the individual would miss two or more days of work a month on a consistent basis.  (Doc. 8-3, p. 50).  Mr. Adams testified that in his experience, larger employers would dismiss unskilled workers for missing two days in a single month.  (Doc. 8-3, p. 50).

## THE ALJ'S DECISION

The ALJ found that Ms. Sanders had last engaged in substantial gainful activity on October 7, 2017, the alleged onset date, and met the insured status requirements through June 30, 2019.  (Doc. 8-3, p. 18).[12]  The ALJ determined that Ms. Sanders suffered from the severe impairments of degenerative disc disease, degenerative joint disease, major depressive disorder, and anxiety.  (Doc. 8-3, p. 18). The ALJ also determined that Ms. Sanders had the non-severe impairments of post-hernia surgery lifting restrictions, post laparoscopy and splenectomy restrictions, and carpal tunnel syndrome.  (Doc. 8-3, p. 18).  The ALJ acknowledged Ms. Sanders's fibromyalgia diagnosis but found it was not a medically determinable

---

[12]  A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A).  If a claimant becomes disabled after her insured status expires, the ALJ must deny the disability insurance benefits claim.  The date of last insured requirement does not apply to a claim for SSI benefits.

impairment under Social Security Ruling 12-2p because the record contained "no evidence she met the requisite tender point exam criteria." (Doc. 8-3, p. 19). Based on a review of the medical evidence, the ALJ concluded that Ms. Sanders did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 8-3, p. 19).

Considering Ms. Sanders's impairments, the ALJ evaluated Ms. Sanders's residual functional capacity. (Doc. 8-3, p. 21). The ALJ determined that Ms. Sanders had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is limited to occasionally performing postural maneuvers, including balancing, stooping, kneeling, crouching, crawling, & climbing ramps and stairs. The claimant cannot climb ladders, ropes, or scaffolds. She can perform frequent overhead reaching with the bilateral upper extremities. She must avoid dangerous moving unguarded machinery, or unprotected heights. She can understand, remember, and apply simple instructions and tasks; she is limited to jobs involving infrequent and well-explained workplace changes; she can concentrate and remain on task for two hours at a time, sufficient to complete an eight-hour workday.

(Doc. 8-3, pp. 21).

Based on this RFC and relying on the testimony from the vocational expert, the ALJ concluded that Ms. Sanders could not perform her past relevant work as a hospital cleaner or material handler, but Ms. Sanders could perform her past relevant work as a gate guard because this job did "not require the performance of work-

23

related activities precluded by" Ms. Sanders's RFC.  (Doc. 8-3, p. 27).  Relying on testimony from the vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Ms. Sanders could perform, including salvage bagger, garment sorter, and hand sander.  (Doc. 8-3, pp. 28-29).  Accordingly, the ALJ determined that Ms. Sanders was not disabled as defined by the Social Security Act.  (Doc. 8-3, p. 29).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial evidence, the

district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Sanders argues that the ALJ improperly applied the pain standard and that substantial evidence did not support the ALJ's reasons for discrediting her description of her subjective symptoms. (Doc. 12). The Court disagrees.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through h[er] own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of

the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r of Soc. Sec.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*).   If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r of Soc. Sec.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r of Soc. Sec.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).   If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.  The Commissioner must accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

In evaluating a claimant's symptoms, the provisions of Social Security Regulation 16-3p apply.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4.   Concerning the ALJ's burden when evaluating a claimant's subjective symptoms, SSR 16-3p provides:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)    [the claimant's] daily activities;
>
> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii)  [p]recipitating and aggravating factors;
>
> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Ms. Sanders's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but the ALJ determined that Ms. Sanders's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the file." (Doc. 8-3, pp. 22, 27).  In applying the pain standard, the ALJ recounted in detail Ms. Sanders's medical records, (Doc. 8-3, pp. 22-25); the consultative medical opinions of Dr. Mollohan and Dr. Amason, (Doc. 8-3, pp. 25-26); Ms. Sanders's hearing testimony and function report, (Doc. 8-3, pp. 22, 25-26); and the function report Ms. Sanders's mother completed, (Doc. 8-3, p. 26).  The ALJ correctly applied the pain standard, and substantial evidence supports the ALJ's findings regarding Ms. Sanders's subjective symptoms of pain.

The ALJ found that Ms. Sanders's allegations of disabling pain were inconsistent with the objective medical evidence that showed only "mild to moderate

physical limitations." (Doc. 8-3, p. 26). Ms. Sanders argues that the ALJ minimized the significance of objective medical evidence that "could reasonably cause [Ms. Sanders's] pain and limitations," citing Ms. Sanders's November 2016 and June 2019 MRIs of her cervical and lumbar spine. (Doc. 12, p. 12). The record demonstrates that the ALJ addressed each of these pieces of evidence and appropriately factored them into Ms. Sanders's RFC.

The ALJ noted Ms. Sanders's 2013 fusion surgery and discussed the November 2016 MRI that showed mild disc bulging. (Doc. 8-3, p. 22). The ALJ cited the June 2019 lumbar and cervical spine MRIs that revealed "multilevel degenerative changes, including a mild narrowing of the neural foramina" and "degenerative and postoperative changes with moderate disc bulging at C3-C5." (Doc. 8-3, p. 23). The ALJ noted Ms. Sanders's epidural steroid injections in June and July 2019. (Doc. 8-3, p. 24). The ALJ also addressed Ms. Sanders's nerve conduction testing in June 2019 and September 2019 that showed a "fully normal result in the lower extremities with no evidence of peripheral neuropathy." (Doc. 8-3, p. 24). The MRI and nerve conduction evidence showing mild to moderate physical limitations, coupled with other substantial evidence in the record, supports the ALJ's RFC finding that Ms. Sanders could perform work at the light exertional level with postural limitations.

Ms. Sanders asserts that the ALJ "overlooked portions of the medical record" in assessing her subjective symptoms. (Doc. 12, p. 8). Ms. Sanders argues that the ALJ failed to properly consider the notes of treating physicians that describe subjective complaints of pain. (Doc. 12, p. 12). The record does not support the argument. In applying the pain standard, the ALJ considered Ms. Sanders's longitudinal medical history, including "positive and negative progress notes" from various doctors. (Doc. 8-3, p. 27). The ALJ specifically noted medical records showing Ms. Sanders's complaints that her medications at times barely helped and that she had pain, tenderness, and decreased range of motion in her spine at times. (Doc. 8-3, pp. 22-23). The ALJ's opinion indicates that she examined the entire medical record in applying the pain standard.

To support her finding that Ms. Sanders's pain was not as limiting as she claimed, the ALJ pointed to Ms. Sanders's longitudinal physical examinations with various doctors that "consistently demonstrated good strength, range of motion, and sensation with varying degrees of tenderness to palpation." (Doc. 8-3, p. 26). The ALJ cited Dr. Gantt's April 2017 examination that showed that Ms. Sanders had a normal gait, some decreased range of motion in her spine, normal muscle strength, and intact sensation. (Doc. 8-3, pp. 22-23). The ALJ also noted Dr. Seymour's May 2019 physical examination that showed full motor strength in all extremities, intact sensation, normal deep tendon reflexes, and normal range of motion in the cervical

spine. (Doc. 8-3, p. 23). The ALJ pointed to Dr. Alapati's July 2019 examination that showed no motor weakness, intact sensation to pinprick and vibration, and a full range of motion in both the cervical and lumbar spine. (Doc. 8-3, p. 24). The ALJ also cited Dr. Thacker's examinations from January through July 2020 that showed a mild limitation in Ms. Sanders's range of motion in her spine, a normal gait, full muscle strength in all areas, and normal deep tendon reflexes. (Doc. 8-3, pp. 24-25).

Ms. Sanders medical records indicate that she reported her pain at 4/10 to 6/10 during many of her appointments. (Docs. 8-12, pp. 3; Doc. 8-13, pp, 51, 55, 60, 68, 73, 105, 117). Although Ms. Sanders's rated her pain at 5/10 to 6/10 at best, she reported pain levels between 2/10 and 3/10 during Dr. Mollohan's examination in February 2018. (Doc. 8-12, pp. 58, 60). These pain levels do not indicate disabling pain that would cause Ms. Sanders to lie down and sleep for hours each day.[13] Substantial evidence in the record supports the ALJ's finding that Ms. Sanders's physical examinations revealed no significant abnormalities or debilitating pain that would prevent her from working at a light exertional level with additional limitations.

---

[13] The Court recognizes that Ms. Bailey attributed Ms. Sanders's change in personality and her lack of interest in activities to her back pain. Though back pain may have contributed to Ms. Sanders's depression and anxiety, her lack of activity appears to be more a consequence of her depression than her back pain.

The ALJ also considered Dr. Mollohan's and Dr. Amason's opinions to support her conclusion that Ms. Sanders's pain was not as limiting as she claimed. (Doc. 8-3, pp. 23, 25).  The ALJ cited Dr. Mollohan's examination that indicated Ms. Sanders did not have cervical or lumbar radicular pain or neuropathy and had a normal range of motion and full muscle strength in her extremities.  (Doc. 8-3, p. 23).  Although Dr. Amason opined that Ms. Sanders could frequently perform all postural maneuvers for work at the light exertional level, the ALJ found Dr. Amason's opinion "mostly persuasive" and limited Ms. Sander's RFC to only occasional postural maneuvers.  (Doc. 8-3, p. 25).  Dr. Mollohan's and Dr. Amason's medical opinions support the ALJ's assessment of Ms. Sanders's subjective symptoms and the ALJ's RFC finding that Ms. Sanders could work at the light exertional level with additional limitations.

Ms. Sanders argues that the ALJ erred in applying the pain standard regarding daily activities.  (Doc. 12, p. 13).  Ms. Sanders asserts that the ALJ omitted several limitations that Ms. Sanders mentioned when reporting her daily activities, including difficulties dressing, shopping, cooking, and cleaning.  (Doc. 12, p. 14).  In fact, the ALJ cited Ms. Sanders's function report and noted that Ms. Sanders "reported difficulty tending to her personal care and did limited housework."  (Doc. 8-3, p. 22).  The ALJ noted Ms. Sanders's mother's third-party report that Ms. Sanders could "perform most personal care without a problem, do light housework, prepare[]

dinner, lift light weight, and walk for short distances." (Doc. 8-3, p. 26). The ALJ also considered Ms. Sanders reports to Dr. Alapati in June 2018 and July 2019 that she could provide self-care in all her activities of daily living. (Doc. 8-3, pp. 23-24; Doc. 8-12, p. 105; Doc. 8-13, p. 34). The ALJ did not ignore Ms. Sanders's limitations in her daily activities and properly considered them in applying the pain standard.

In sum, substantial evidence supports the ALJ's findings that Ms. Sanders's physical limitations because of her back pain did not prevent her from doing light exertional work with additional exertional and non-exertional limitations. Because the ALJ properly applied the Eleventh Circuit pain standard, and substantial evidence supports her analysis under this standard, Ms. Sanders is not entitled to relief on this issue.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision. The Court will enter a final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 29, 2023.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE